# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> JOHN THOMAS III, ) <br> ) <br> Defendant. ) <br> _____ ) | Case No.  2:15-cr-00062-JCM-CWH <br><br> **FINDINGS AND RECOMMENDATION** |

This matter is before the Court on John Thomas III's ("Thomas") motion to suppress the seizure of a firearm (ECF No. 74), filed August 26, 2015, the government's response (ECF No. 80), filed September 10, 2015; Thomas's motion to suppress statements (ECF No. 75), filed August 27, 2015, the government's response (ECF No. 81), filed September 14, 2015; and Thomas's motion to suppress cell phone and contents (ECF No. 78), filed September 2, 2015, and the government's response (ECF No. 83), filed September 21, 2015.  The Court conducted an evidentiary hearing on September 30, 2015.  (Mins. of Proceedings (ECF No. 86); Tr. of Proceedings (ECF No. 89).) Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule IB 1-4, the undersigned issues the following Findings and Recommendation.

## I. BACKGROUND

Thomas is charged in a Superseding Criminal Indictment (ECF No. 56) with one count of Conspiracy to Possess a Controlled Substance with Intent to Distribute (Marijuana) in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(D) (Count One) and one count of Use of a Firearm During and in Relation to a Crime of Violence (Resulting in Death) in violation of 18 U.S.C. §§ 924(c)(1)(A), 924(j), and 2 (Count Two).  By way of these three motions, Thomas moves to suppress all tangible and testimonial evidence seized during the police investigation on November 30, 2013 and December 1, 2013.

1   Thomas contends that his Fourth and Fifth Amendment rights were violated because
2   (1) police seized a firearm from his Mercedes vehicle without a warrant or his consent, (2) police
3   failed to advise him of his Miranda rights when he was interrogated at the police station, and
4   (3) police seized his cell phone without a warrant after he was interrogated.  The Government
5   responds that Thomas consented to the seizure that resulted in the seizure of the firearm, that he
6   was not in custody during his interrogation, and that the cell phone was seized incident to his arrest,
7   and was later searched pursuant to a valid search warrant.

## II. DISCUSSION

9   On the evening of November 30, 2015, police officers from the North Las Vegas Police
10  Department ("NLVPD") were investigating a homicide at an apartment complex on Cheyenne
11  Avenue in Las Vegas, Nevada.  Evidence of pistol and shotgun use was found at the scene.  Police
12  discovered a Honda Accord automobile near the crime scene that was of interest because it
13  appeared to have been hit by shotgun pellets.  The Honda was registered to John Thomas, Jr., who
14  is Thomas's father.  Around midnight, NLVPD officers Antonio Gomez, William Silva and Jeffrey
15  Wall went to Mr. Thomas's home on Noble Street, Las Vegas, and inquired about whether he
16  owned the vehicle.  Mr. Thomas advised the officers that he owned the Honda but that it was
17  driven by his son, the defendant in this case.  At the officers' request, Mr. Thomas summoned his
18  son by telephone, and Thomas arrived at the home about 20 to 30 minutes later.  Before Thomas
19  appeared at his parents' home, Mr. Thomas also advised the officers that Thomas owned a firearm.

20  Officer Gomez testified that when Thomas arrived, he was asked whether he owned a
21  firearm.  Thomas confirmed that he owned two firearms, and that one was in the Mercedes that
22  Thomas owned, which was parked in the home's driveway.  The officers spoke with Thomas
23  briefly about his activities for the day.  Thomas then took the officers to the Mercedes and pointed
24  to a gun which was in plain view on the seat of the car.  Thomas identified the firearm as a Glock
25  30, caliber .45.

26  Officer Gomez asked Thomas if he would give his permission to search the car and to
27  retrieve the pistol.  Officer Gomez testified that he believed the firearm might have been pertinent
28  to the homicide investigation.  Thomas verbally consented to the search.  Gomez testified that he

1   then asked Thomas to complete a written consent to search form to "solidify" the fact of Thomas's
2   consent, and Thomas signed the form. (Gov't Ex. 1.) For the same reason, Officer Gomez then
3   asked for, and obtained, a handwritten statement from Thomas that read, "out of my own free will, I
4   give the North Las Vegas Police Department permission to take the Glock 30 from the car." (Gov't
5   Ex. 2.) NLVPD criminal investigators later arrived at the scene and seized the Glock 30 from the
6   Mercedes. It is this firearm which Thomas moves to suppress.

7   NLVPD Officers Gomez, Silva and Wall each testified that at no time was Thomas
8   handcuffed, nor were their service weapons ever drawn. Officers Gomez, Silva and Wall each
9   testified that they were present when Thomas consented, both orally and in writing, to the search of
10  the Mercedes. They also testified that they were with Thomas while waiting for the criminal
11  investigators to arrive to conduct the search of the Mercedes and that at no time did Thomas
12  withdraw his consent.

13  Mr. Thomas, Thomas's father, testified that when the officers arrived, he invited them into
14  his home to talk with them. He told the officers that the vehicle was his son's car, and agreed to
15  summon his son so that the police could speak with him. He confirmed that his son owned a
16  firearm. His son arrived in about 20 to 30 minutes, and he came into the house to speak with the
17  officers. Mr. Thomas testified that he did not have a private conversation with his son outside of
18  the officers' presence. Mr. Thomas testified that the officers then took Thomas outside of the
19  house while Mr. Thomas and his wife remained in the house. After a short while, Mr. Thomas
20  testified that he decided that the matter might be serious, and so he went outside and told Thomas,
21  "John, you need to get a lawyer." He then walked back into the house, and he did not hear any
22  response from Thomas. Mr. Thomas testified that did not hear any conversations between the
23  police and his son regarding a gun or about consent to search the Mercedes.

24  Thomas testified that in response to his parent's call, he arrived at his parents' house at
25  about midnight. He testified that when he arrived, he was met by two officers who patted him
26  down for weapons and then handcuffed him behind his back. He indicated that the handcuffs were
27  then removed and they entered the house, and he was asked about whether he had a gun. In
28  response, he took the officers to the Mercedes, which is where the gun was located, and pointed to

3

the gun. He admitted that he read and signed the search consent form, although it was not read to him, and he also wrote and signed the statement indicating that he gave permission for the officers to take the Glock 30 from his vehicle. Thomas testified that after he signed the statement and the form, he told the officers that he needed a lawyer, and that he did not want to consent to the search, he just wanted to make a statement. Thomas testified that Officer Gomez placed the consent forms in his binder and told him that once he had consented, the officers could do the search. Thomas said he said, "okay," and testified on cross-examination that he did not realize until later that he could revoke his consent.

Officers Silva and Wall were called in rebuttal and asked whether they had witnessed a private conversation between Mr. Thomas and his son. Both officers testified that before Thomas went outside to show them where the Glock 30 was located, the officers went outside and allowed Mr. Thomas to speak privately with his son. Officer Silva said that he stood by the door and eavesdropped on the conversation, and testified that Mr. Thomas told his son that his story did not make sense,[1] and that he needed to be truthful with the officers. Officer Wall heard Officer Silva report the conversation as they stood outside the front door. Officer Silva testified that he did not hear Mr. Thomas advise his son that he needed to get a lawyer.

Thomas argues that under the totality of the circumstances, considering his young age, immaturity, and that he had just suffered a serious wound requiring medical attention,[2] his will was overborne and his consent was not voluntary. Alternatively, he argues that he withdrew consent before the search. The government responds that Thomas consented to the search both orally and twice in writing, and that he never withdrew his consent.

/ / /

/ / /

---

[1] The full extent of the conversations between the officers and Thomas at the home, to which Mr. Thomas was apparently referring, was not provided during the hearing. The Court therefore is not clear what part of the "story" did not make sense.

[2] As will be explained below, Thomas was shot by a shotgun earlier that evening.

**A. Seizure of the Glock 30**

Reasonableness is the foundation of Fourth Amendment jurisprudence. *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (*citing Katz v. United States*, 389 U.S. 347, 360 (1967)). "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Id.* (*citing Illinois v. Rodriguez*, 497 U.S. 177 (1990)). Consensual searches are allowed because it is reasonable for law enforcement agents to conduct a search after receiving consent. *Id.* at 250-51. "A suspect is free, however, after initially giving consent, to delimit or withdraw his or her consent at anytime." *United States v. McWeeney*, 454 F.3d 1030, 1034 (9th Cir. 2006).

The government has the burden of demonstrating that consent to a warrantless search was voluntary. *United States v. Chan-Jimenez*, 125 F.3d 1324, 1327 (9th Cir. 1997). Voluntariness is "'to be determined from the totality of all the circumstances.'" *Id.* (*citing Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). The Ninth Circuit generally considers five factors in assessing voluntariness: "(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that she had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *United States v. Payayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2003). These factors "are only guideposts, not a mechanized formula to resolve the voluntariness inquiry." *Id.* at 502. "[I]t is not necessary for all five factors to be satisfied in order to sustain a consensual search." *United States v. Cormier*, 220 F.3d 1103, 1113 (9th Cir. 2000); *see also Patayan-Soriano*, 361 F.3d at 502 (reiterating that "[n]o one factor is determinative in the equation").

Applying the first factor of the five-factor test of whether Thomas's consent was voluntary, the Court finds that Thomas was not in custody. Thomas's testimony that he was placed in handcuffs upon his arrival at his home is at odds with that of all three officers who testified affirmatively that Thomas was never handcuffed, and it also lacks any support from the testimony of his father, who did not testify that Thomas was in handcuffs. The Court finds the testimony of the three officers, each of whom testified that Thomas was not handcuffed, to be more credible than Thomas's testimony that he was handcuffed when he first arrived outside the house, and then was

1  immediately un-cuffed before he entered the house.  Even if Thomas was initially handcuffed upon
2  arrival, the fact that according to Thomas he was immediately un-cuffed and was allowed to meet
3  with his father before going outside with the officers is persuasive that at the time that he gave
4  consent to the search of the Mercedes, Thomas was not in custody, nor did he reasonably believe he
5  was in custody.
6        As for the remaining factors, there was no testimony by any witness indicating that the
7  police had their guns drawn.  There is no evidence that Miranda warnings were administered.  As to
8  whether Thomas was notified that he had a right not to consent, Officer Gomez did not recall
9  whether he read the form to Thomas that Thomas signed, but the form did say that Thomas had the
10 right to refuse consent for the search, and that no threats or coercion of any kind had been used to
11 obtain consent.  (*See* Gov't Ex. 1.)  There is no evidence that Thomas was told that a search
12 warrant would be obtained if he refused consent, or that his refusal was futile.
13       Officer Gomez took extraordinary efforts to obtain Thomas's consent to seize the Glock 30
14 from the Mercedes.  He obtained oral consent, then obtained Thomas's signature on a "consent to
15 search" form, and then obtained a handwritten statement from Thomas that he specifically
16 consented to the seizure of the Glock 30.   Thomas testified that he gave consent for the search.
17       There is no factual basis to support Thomas's argument that he was suffering from a serious
18 wound.  Thomas did not testify that he was under the stress of his shotgun wound, and he did not
19 tell Officers Gomez, Silva, or Wall of the injury.  The first time Thomas mentioned the injury was
20 during his conversation with Detective Suranowitz at the police station when he stated that he got
21 shot but rinsed the wound in the shower, and further stated he did not need medical care.  (Gov't
22 Ex. 3, lines 227-251.)  Accordingly, the Court finds that Thomas was not under the stress of his
23 wound when he gave consent to seize the Glock 30.
24       Contrary to Thomas's argument, Thomas was not so youthful and immature that his ability
25 to decide whether to consent to the search of the Mercedes was overborne by the officers.  The
26 Court observed Thomas as he testified in this case, and reviewed the transcript of his interview
27 with Detective Suranowitz, and is not persuaded that Thomas's youth and maturity had any role in
28 his decision to consent to the seizure of the Glock 30 from the Mercedes.  Thomas was 21 years old

at the time of the investigation, appears to be articulate and intelligent, and exhibits no signs of being immature or lacking mental competency.  The Court finds that Thomas was not under the burden of immaturity when he gave consent to the search of the Mercedes.

Based on the totality of the circumstances and evidence presented, the Court finds that Thomas voluntarily and without coercion consented to the search of the Mercedes and the seizure of the Glock 30, which was in plain view within the Mercedes.

Finding consent, however, does not end the analysis.  Thomas testified that after he gave consent, while he was outside with the officers and before the search, he withdrew that consent by telling the officers that he needed a lawyer, that he did not want to consent, and that he just wanted to write a statement.  Thomas's testimony is in stark contrast with that of the three officers on the scene, each of whom testified that Thomas did not at any time revoke his consent.  The Court therefore must make a credibility determination as to the evidence on this point.  Officers Gomez, Silva, and Wall each testified that they were present with Thomas while they waited for criminal investigators to arrive to seize the Glock 30, and the officers appeared to have clear recollections of the events that evening.  Officer Gomez additionally testified that if Thomas had revoked his consent, he would have honored the withdrawal.  Similarly, Officer Silva testified that if Thomas had withdrawn consent, they would simply have called for detectives to obtain a search warrant.  Officer Gomez had been thorough in obtaining Thomas's consent because he was investigating a homicide and wanted to "solidify" the consent by obtaining multiple forms of consent, and testified that he would not have ignored a comment by Thomas that he revoked his consent.  Thomas, on the other hand, has cause to fabricate his story because he is facing prosecution for serious offenses which turn on the admissibility of the Glock 30.  Additionally, Thomas's claim that he was initially handcuffed when he arrived at the house was not credible, which detrimentally impacts this Court's view of his credibility.  The Court therefore finds that Thomas's testimony is not credible, and that he did not revoke his consent.  Accordingly, the Glock 30 was seized based upon Thomas's voluntary consent which was not revoked, and will not be suppressed.

/ / /

/ / /

**B. Statements Taken at the Police Station**

After the firearm was seized, Officer Gomez testified that he asked Thomas if he would be willing to talk to him at the police station. Officer Gomez testified, as did Officers Wall and Silva, that Thomas was told that he was not under arrest or being detained, and that he did not need to go to the police station if he did not want to go. Officer Gomez testified that Thomas agreed to go to the police station, was not handcuffed when he was transported, and was told that if he wanted to go home, an officer would drive him back to his house. Officer Silva similarly testified that Officer Gomez told Thomas that he did not have to go to the police station, and that he was not under arrest. According to Officer Silva, Thomas said that he understood that he was not under arrest, and that he agreed to go to the police station. Thomas was then transported to the police station by Officers Gomez and Silva, and was told, according to all three officers, that if he wanted to go home, they would drive him home.

Thomas testified that he was asked to go to the police station, and was told that he was not required to go, and that he was free to leave. He testified that he did not want to go, and only went because he was not allowed to go back into his house by Officer Gomez. He also testified that he was not forced to go to the police station.

Once Thomas arrived at the police station, he was interviewed by Detective Mark Suranowitz. According to the transcript of the interview, Thomas was advised that it was a voluntary interview, that he was free to leave at any time, and that the officers would take him home at his request. (Gov't Ex. 3, lines 54-61.)

There is no evidence that Miranda warnings[3] were ever given to Thomas. Thomas and Detective Suranowitz discussed the incident for about an hour. During the interview, Thomas stated that he was advised to get a lawyer before saying anything, and asked what the consequences would be if he spoke to the detective now, and then spoke with a lawyer. He also clearly indicated several times that he wanted to consult with a lawyer before answering the Detective's questions. (*See, e.g.*, Gov't Ex. 3, lines 63-74, 816, 858, 877, 969.) Thomas disclosed that he had been shot

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 445 (1966).

by a shotgun, and Detective Suranowitz later arranged for medical treatment. (Gov't Ex. 3, lines 228-252.) Detective Suranowitz pressed Thomas to explain the circumstances surrounding his injury, but Thomas was unwilling to do so without first consulting with counsel. Thomas did admit that he had fired his firearm while he was at the apartment complex where the homicide had occurred. Eventually, Thomas and Detective Suranowitz reached an impasse in their discussions, Thomas asked to leave, and the interview was terminated. (Gov't Ex. 3, line 1065.) Detective Suranowitz testified that based upon the information obtained during the interview, Thomas was arrested for discharging a firearm in a public area.

Thomas's testimony at the evidentiary hearing was difficult to follow. He first said that he believed he had no choice but to go to the police station because he said the officers would not allow him to return to his house, but then he admitted that he went of his own free will to the police station, and participated freely and voluntarily in the interview. He also testified that he did believe he was free to leave the police station, but could not do so because the officers had previously said he could not return to his home.

Thomas argues in his motion that after he received his Miranda warnings, he invoked his right to counsel, but questioning continued, and consequently, statements taken from him should be suppressed. (Mot. to Suppress (ECF No. 75) at p. 2, line 9 ("After being Mirandized, he was questioned. . . .").) The government argues that Thomas did not receive Miranda warnings because he was not subjected to a custodial interrogation, and therefore the detective was not obligated to cease questioning once he asked for a lawyer.

Consistent with the testimony of all officers, the Court finds that Thomas was not administered his Miranda warnings at any time during his interaction with the police. Thus, the Court must determine whether Thomas should have received Miranda warnings. If he was entitled to receive his Miranda warnings, but did not, then his statements should be suppressed. The obligation to administer Miranda warnings attaches once a person is subject to "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 445 (1966). "Whether a suspect is in custody turns on whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *U.S. v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005)

1  (quotation omitted).  "In determining whether an individual was in custody, a court must examine
2  all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether
3  there [was] a formal arrest or restraint on freedom of movement of the degree associated with
4  formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quotation omitted).  The
5  question is whether a "reasonable innocent person in such circumstances" would understand that
6  she could refuse to answer officers' questions and leave. *United States v. Booth,* 669 F.2d 1231,
7  1235 (9th Cir. 1981).  Facts relevant to the determination of whether a person is in custody "include
8  the language used by the officers, the physical characteristics of the place where the questioning
9  occurs, the degree of pressure applied to detain the individual, the duration of the detention, and the
10  extent to which the person was confronted with evidence of guilt." *United States v. Hernandez*,
11  476 F.3d 791, 796 (9th Cir. 2007) (quotation omitted); *see also Howes v. Fields*, 132 S.Ct. 1181,
12  1189 (2012) (setting forth a non-exhaustive list of factors that are pertinent to the determination
13  whether a reasonable person would have believed he could freely walk away from the
14  interrogators).

15  According to the testimony of Officers Gomez, Wall, and Silva, Thomas voluntarily
16  presented himself for a police interview after being told, and indicating that he understood, that he
17  was not under arrest, did not have to go to the police station, was free to leave at any time, and that
18  officers would take him home.  Additionally, upon arrival at the interview, he was again told by
19  Detective Suranowitz that he was free to leave any time, he could just open the door and leave, and
20  that the officers would take him back home.  (Gov't Ex. 3, lines 54-61.)  It is true that the interview
21  took place at the police station, and the room in which the interview took place is depicted in the
22  video of the interview a simple small office with a table and two chairs.  (*See* Gov't Ex. 4.)  But a
23  non-custodial interview is not transformed into a custodial one simply because "the questioning
24  takes place in the station house, or because the questioned person is one whom the police suspect."
25  *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).  Thomas was not handcuffed.  The one-on-one
26  interview with Detective Suranowitz took about one hour.  Thomas conceded on cross-examination
27  that he participated freely and voluntarily in the interview and that he was not forced to go to the
28  police station.  Although he also testified that he did not believe he was free to leave because the

1  officers allegedly told him he could not go home, the transcript of the interview shows that he was
2  told he could leave.  On cross examination, Thomas admitted that he had his telephone and could
3  have called his friend who gave him a ride to his parents' house.  Finally, Thomas must have
4  believed that he could leave at any time because after he and Detective Suranowitz reached an
5  impasse in their discussions, Thomas said, "I'd like to go, sir."
6      The Court finds that Defendant was not in custody during the interview at the police station,
7  and consequently, rights under *Miranda* did not attach.  *See Mathiason*, 429 U.S. at 495 (finding
8  that a defendant who voluntarily went to the police station, was immediately informed that he was
9  not under arrest, and after the interview, did in fact leave the station, was not in custody); *see also*
10 *United States v. Crawford*, 372 F.3d 1048, 1059-60 (9th Cir. 2004) (en banc) (finding no custody
11 when defendant agreed to go to the FBI office and was told that he was not under arrest).
12 Accordingly, although Thomas did request to speak to a lawyer during his interview, Detective
13 Suranowitz had no duty to stop the interview under Miranda because Thomas was not in custody.
14 Accordingly, the statements made by Thomas at the police station should not be suppressed.
15 **C.  Seizure of the Cellular Telephone**
16     Detective Suranowitz testified that at the end of the interview, Thomas was arrested for
17 unlawfully discharging a firearm in a public area.  (*See also* Gov't Ex. 3, lines 408-456 (describing
18 the discharge of the weapon).)   Detective Suranowitz testified that he seized Thomas's cellular
19 telephone incident to Thomas's arrest.  Detective Suranowitz testified that during the interview,
20 Thomas referred to telephone numbers in his telephone to provide the number of the person who
21 had given him a ride from the scene of the shooting.  (*See also* Gov't Ex. 3, lines 198-235.)
22 Detective Suranowitz testified that he seized the cellular telephone to preserve evidence by
23 ensuring that relevant information about the investigation would not be deleted, and to ensure that
24 nobody would be contacted about the ongoing investigation.  Detective Suranowitz subsequently
25 obtained a search warrant to search the contents of the cellular telephone.  Thomas does not
26 challenge the validity of the search warrant for the cellular telephone.
27     Thomas argues that the Supreme Court has accorded cellular telephones enhanced privacy
28 rights under the Fourth Amendment, and that a cellular telephone cannot be seized and viewed

11

without a warrant. The government responds that the seizure of the cellular telephone was incident to Thomas's arrest, but that it was not searched until the search warrant was obtained. Factually, the government is correct – there is no evidence that the cellular telephone was searched before the time that the police obtained a search warrant. Thus, the issue before the Court is whether the cellular telephone was lawfully seized.

A police officer who makes a lawful arrest may conduct a warrantless search of the arrestee's person and the area "within his immediate control." *Chimel v. California*, 395 U.S. 752, 763 (1969). Such a search is conducted for the twin purposes of finding weapons the arrestee might use or evidence the arrestee might conceal or destroy. *Preston v. United States*, 376 U.S. 364, 367 (1964). In the Ninth Circuit, the determination of the validity of a search incident to arrest is a two-fold inquiry: (1) was the searched item "within the arrestee's immediate control when he was arrested" and (2) did "events occurring after the arrest but before the search ma[k]e the search unreasonable"? *United States v. Turner*, 926 F.2d 883, 887 (9th Cir. 1990).

Here, the cellular telephone was on Thomas's person, and there were no intervening events to make the seizure unreasonable. Thomas makes no contrary argument. Nor does he argue that his arrest was illegal. The Court finds that the cellular telephone was seized from Thomas's person and there was probable cause to arrest him for unlawfully discharging a firearm in a public area. Accordingly, the motion to suppress the cellular telephone seized from Thomas is denied.

## RECOMMENDATION

Accordingly, **IT IS HEREBY RECOMMENDED** that Thomas's motion to suppress the seizure of a firearm (ECF No. 74) be **DENIED**.

**IT IS FURTHER HEREBY RECOMMENDED** that Thomas's motion to suppress statements (ECF No. 75), be **DENIED**.

**IT IS FURTHER HEREBY RECOMMENDED** that Thomas's motion to suppress the cell phone and contents (ECF No. 78) be **DENIED**.

## NOTICE

This report and recommendation is submitted to the United States District Judge assigned to this case under 28 U.S.C. § 636(b)(1). A party who objects to this report and recommendation may

file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation.  Local Rule IB 3-2(a).  Failure to file a timely objection may waive the right to appeal the District Court's Order.  *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED: November 3, 2015.

_____
**C.W. Hoffman, Jr.**
**United States Magistrate Judge**